**OREGON SHORT LINE R. CO. v. KIMAMA HIGHWAY DIST. et al.**

(District Court, D. Idaho, S. D. February 12, 1923.)

No. 1023.

I. Highways ⬤═90—Petition for organization of highway district held insufficient.

Proceedings to convert a good roads district into a highway district under Comp. St. Idaho 1919, § 1502, were wholly insufficient, where, of the required 20 signers on the petition holding title or evidence of title to lands in the district, six were but entrymen on public lands, who had neither procured nor earned title.

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Highways ☜➡90—Conversion of good roads district into highway district may be attacked after six months.**

The right to question the proceedings for converting a good roads district into a highway district, under Comp. St. Idaho 1919, § 1502, is not affected by section 1495, limiting the time to six months within which to attack proceedings for organization of a highway district; such limita-·tion applying only to original proceedings for organization of highway districts under section 1480 et seq.

**3. Highways ☜➡90—Legal existence of de facto district not subject to collateral attack by private citizen.**

A highway district, though defectively and irregularly organized out of a good roads district, under Comp. St. Idaho 1919, § 1502, is to be deemed a de facto corporation, where for more than two years it has functioned as such, levying and collecting taxes as a highway district, and its legal existence cannot be called into question on collateral attack by a private citizen.

**4. Highways ☜➡90—Powers of district limited to construction of roads for benefit of people and property therein.**

A highway district is not a political municipality, but its powers are specially limited to the construction of highways for the benefit of the people and property therein, and when it is an authorized taxing district its powers of taxation are limited to those purposes.

**5. Highways ☜➡90—District bond issue, to build road in uninhabited country paralleling railroad, which would be assessed almost the entire cost, enjoined as confiscatory.**

Where a highway district containing 96,000 acres, for the most part uninhabited public domain, known as arid sagebrush land, without timber, mineral, grazing, or other resources, and without towns, villages, or farms, voted to issue $90,000 bonds for the construction of a highway paralleling railway tracks for the admitted purposes of forming part of a through highway, the cost of which, to-the extent of about 95 per cent., must be borne by the railroad, because its property comprises that per cent. of all property in the district, the railroad company was entitled to injunction to restrain such bond issue as unreasonable, arbitrary, and confiscatory.

In Equity. Suit by the Oregon Short Line Railroad Company against the Kimama Highway District and others to enjoin a highway bond issue. Decree for plaintiff.

Geo. H. Smith, of Salt Lake City, Utah, and H. B. Thompson, and John O. Moran, both of Pocatello, Idaho, for plaintiff.

Sullivan & Sullivan, of Boise, Idaho, and Paul S. Haddock, of Shoshone, Idaho, for defendants.

DIETRICH, District Judge. Formerly the territory of defendant Kimama highway district constituted Kimama good roads district, and is all within Lincoln county, Idaho. In September, 1919, proceedings were taken under the provisions of an act approved March 12, 1919 (Session Laws of Idaho, 1919, p. 141; section 1502, Idaho Compiled Statutes), to convert it into a highway district, and order to that effect was entered by the board of county commissioners, which the plaintiff contends was without jurisdiction, and hence void. However that may be, the highway district was organized, and at an election called by the board of highway commissioners in July, 1922, it was unanimously voted to authorize the issuance of bonds in the amount of

$90,000, for the construction of a road from east to west through the district, parallel with the plaintiff's railroad track, and it is alleged that, if not restrained from so doing, the board will issue and sell such bonds, to the plaintiff's great injury, and it is for the purpose of securing such injunctive relief that the plaintiff has brought this suit. The legal propositions upon which it relies can best be disclosed by a statement of the facts, which, in the main, are undisputed.

The district is approximately 10 miles wide north and south and 15 miles long east and west, and has an area of about 96,000 acres. Running through it in an easterly and westerly direction is the plaintiff's right of way for its main line of railroad from Green River, Wyo., to Huntington, Or. As already suggested, the road to be constructed is substantially parallel with the railroad, and is designed to be a section of a state and national highway extending indefinitely through and beyond the boundaries of the state. The territory embraced within the district is for the most part public domain of the United States, and is what is known as arid, sagebrush land, in part susceptible to cultivation if water is made available for its irrigation, but, without water, suited to neither cultivation nor habitation. Whether it will ever be irrigated is still problematical, and the most that can be said is that there is ground for the hope, scarcely for the expectation, that at some time in the future water will be provided. There is no timber or mineral deposit or other natural resource within or in the vicinity of the district, nor any town or village, the nearest places of this character being small village communities about 15 miles easterly and westerly from the district, upon the line of plaintiff's railroad. Within the district the plaintiff has three points—Sid, Senter, and Kimama—where it maintains side or passing tracks, and at this last-named point it maintains a station, with a station agent. At this place, also, there is a little store, and in addition to the railroad employés there are three or four families.

It is to be inferred that at one time it was hoped that water would be provided in the near future for the irrigation of some of the lands, or it was thought "dry farming" might be carried on successfully, and a number of entries on public land were made and a town site laid out at Kimama, but the few farmhouses, apparently five or six, and the little church building, within the territory, have now been abandoned. Some idea of the agricultural production may be gotten from the railroad business transacted at Kimama and the other sidings in the district. In 1918 only a little more than one carload of wheat was shipped out, and about the same amount in 1919, nothing in 1920, in 1921 two carloads, and in 1922 one carload. No other products of the soil were sent out. Other shipments for this period were a carload of immigrant movables, and several carloads of sheep. That the defendants practically admit that there is no local need or use for the road, but that it is simply to be a link in a through highway, is apparent from the written brief submitted:

"The evidence shows [so it is stated] that in the case at bar the particular highway in question through the Kimama highway district has been designated as a through state highway."

And further:

. "The evidence shows that [in the year 1922] the farms in the district had been abandoned with the exception of two; that the improvements were being taken off of the farms. Plaintiff's own witness testified that the land was of no value, except for grazing purposes, and it is common knowledge, of which the court may take judicial notice, that desert lands in that portion of southern Idaho have little or no value as grazing lands."

At the time of the hearing (December, 1922) there was but one farmer left in the district. In 1921 the assessed value of all the property in the district was $988,894, of which total $923,715 was for the plaintiff's railroad, and $65,179 for all other property, real and personal. In other words, the railroad valuation represented 93.4 per cent. of all property in the district, and of the $65,179 only $44,000 was assessed upon farms and town site, and other local property; the balance of about $21,000 being on telegraph lines, Pullman cars, and other public utility property. In 1922 the plaintiff's valuation was the same, and other public utility property about the same, but the town site was dropped from $1,154 to $440, and farm and other local property from $42,989 to $21,805, thus making the plaintiff's percentage of the tax-bearing valuation still greater. And, as throwing some light on the character of the land embraced in the district, the purpose for which it is used, and its promise of either passenger business or freight, it is to be added that all of the so-called farm lands privately owned are classified by the assessing officers of the county as either "grazing" or "waste," with a valuation on the former of $5 per acre in 1921, and $2 per acre in 1922, and on the latter of $1 per acre for each of the two years.

Corroborated by all the circumstances in evidence, the witnesses who testified upon the subject expressed the opinion that, except during the construction period, the road to be built would contribute nothing to the plaintiff's business, and it is apparent that in the long run, being parallel with plaintiff's track, and a part of a through highway, it will have a tendency to divert to power-driven vehicles both passenger and truck business which otherwise the plaintiff would get. In short, it is thought to be clear that the plaintiff can expect no net benefit from this public work, which is to cost $90,000, and of which amount, in all human probability, it will have to pay 95 per cent., or over $85,000, if the proposed bonds are issued.

Turning, now, to the facts in another aspect of the case. Under the law (Compiled Statutes of Idaho, § 1480 et seq.), the formation of a highway district must in the first instance be "proposed" by at least 50 landowners within the district; but under the provisions of section 1502, already referred to, a "good roads district," created under a different statute, may be converted into a highway district upon the vote of a majority of the qualified electors therein voting on the question at an election therefor, regardless of the area of the district or the assessed valuation of the property, provided that such an election can be called only upon the petition of at least 20 "holders of title or evidence of title" to lands therein. It is further provided by law that bonds of a highway district, not in excess of 10 per cent. of the assessed value of the property therein, "for the purpose of the

construction, improvement, or repair of any of the highways within the district," may be issued upon the assent of two-thirds of the qualified electors voting at an election held for that purpose, pursuant to a resolution of the highway board.

Upon the petitions by which the proceedings were initiated to convert the good roads district into the defendant highway district, there were 20 names and no more; but of these 20 signers only 14 were holders of title to land or evidence of title, which, as we have seen, is a requisite qualification prescribed by law. The other 6 were but entrymen on public lands, title to which they had neither procured nor fully earned. At the subsequent election, at which the question of the issuance of the $90,000 bonds was submitted, 11 qualified electors voted, of whom but 4 were property holders; the aggregate assessed value of their property being $2,000.

[1] It is too clear for extended discussion that the petition by which the proceedings to convert the good roads district into a highway district were initiated was insufficient. To give such a petition any standing, it must be signed by at least 20 "holders of title or evidence of title." Six of the 20 signers here were only entrymen of public lands, to which they had neither the legal nor the equitable title. They were simply in the process of earning the title, which, and the evidence of which, the government held.

[2] Nor am I able to take the view that plaintiff's rights are cut off by the provisions in section 1495, Compiled Stat. Idaho, barring attacks upon the validity of the organization proceedings after the expiration of six months. Admittedly upon its face this provision relates alone to the organization of highway districts de novo, and not to conversions of good roads districts into highway districts. The contention is that the limitation is made applicable to the present case by the last sentence of section 1502, generally authorizing and prescribing the procedure for such conversion. But it will be noted that this sentence does not in terms adopt and make applicable to a case of conversion all *provisions* of the law relating to original organization, but only *proceedings* for organization. The language relied upon is:

"Except as in this section otherwise provided, all the proceedings for the organization of a highway district under this section shall be the same as are or may be provided for the organization of highway districts from unorganized territory."

[3] The other contention is that, though irregularly organized, the district is to be deemed a de facto corporation, and its legal existence cannot be called into question by a private person in an action of this character. In that respect it was stipulated at the trial that since February, 1920, the defendant district has "been functioning as a highway district, and holding itself out as a highway district, and has been levying and collecting taxes as a highway district since that time, under color of an organization." Upon this showing of fact I am inclined to think defendant's position is well taken. The general proposition is considered at length in a decision recently rendered by the Supreme Court of the state in Morgan v. Independent School District,

211 Pac. 529 (decision filed December 4, 1922), where there may be found a review of many typical decided cases upon the subject. It is to be borne in mind that this is a collateral attack by a private citizen upon the existence of a public corporation, and that the order assailed was not such an order as the board of county commissioners was without authority to make under any circumstances. If invalid at all, it is not because such an order is entirely beyond the general jurisdiction with which the board is vested, but because certain conditions precedent to the exercise of the power were not complied with.

It remains to consider the contention that the proposed road and the burden which the bonds would impose upon the plaintiff's property would amount to confiscation, or the taking of its property without due process of law, and indeed would be violative of the spirit of the highway district act itself. If the plan can be carried out, and if the courts are powerless to interfere, it is difficult to imagine a case where a large property owner, belonging to a class having neither the ballot nor political power, can feel secure against spoliation under the forms of ingeniously devised legislation. Upon the suggestion of but 20 persons, some of whom owned property and some who did not, some of whom may have been residents and some not, a vast area approximately 90,000 acres, of broken, sagebrush, and for the most part public, land, uninhabited, and with no immediate prospect of being habitable, without resources, and hence in itself with no substantial need for this road, and no reason to expect material benefit therefrom, is constituted a highway district, and upon the vote of 11 persons, having property of the aggregate assessed value of $2,000, this district undertakes, at a cost of $90,000, to build 15 miles of road having no apparent relation to any interest, resource, or activity in the district, and though such road can be of no service to the plaintiff, or benefit to its property, and is more likely to be a detriment, it is to be required to pay approximately 95 per cent. of the cost. In other words, in effect a local segment of plaintiff's railroad is to be assessed at approximately $6,000 per mile, to build a parallel public highway, for which there is no local need or utility, and which will not be of any benefit to the plaintiff, but will only be a part of a through highway, to some extent competitive with its line of railroad. In form, it is true, the burden is not imposed by "local assessment"; but essentially that is what it is.

[4] Courts are reluctant to interfere in the matter of administrative measures, and recognize in legislative and other departments of government a wide discretion in the classification of property for taxation, and for the imposition of the burdens of social and governmental organization; but, unless they are to close their eyes entirely to schemes of virtual confiscation, the line must be drawn somewhere. In considering the legal import of the undisputed facts, it is to be borne in mind that in no real sense is a highway district a unit of state government, nor is it in any very large sense a governmental agency.

"A highway district, as intended by this act, is not a political municipality. It is not created for the purpose of government. It is an entirely different kind

of municipality from that of a city, town, or village. Its powers are specially limited to the construction of highways upon lines of benefits to the inhabitants and the property within the territory embraced within the district. It is made a taxing district, and consists of such territory as may be determined by the county commissioners in creating the same. It is contemplated by the provisions of the statute that the property and the people of the entire district are interested in the construction and improvement of the public highways of the district, and it is created for a special purpose, to wit, the assessment of property within the district for the sole and only purpose of improving the highways within the district." Shoshone Highway District v. Anderson, 22 Idaho, 109, 125 Pac. 219.

Nor does it exercise functions closely analogous to those of a school district, by which the general well-being of the body politic as a whole is protected and safeguarded. As stated in the extract just quoted, it is created for a special and local purpose, namely, the construction and improvement of highways within its borders, for the benefit of the inhabitants and property therein.

In Norwood v. Baker, 172 U. S. 269, 278, 19 Sup. Ct. 187, 190 (43 L. Ed. 443) after adverting to the "large discretion" of Legislatures with reference to taxes, the court said:

"But the power of the Legislature in these matters is not unlimited. There is a point beyond which the legislative department, even when exerting the power of taxation, may not go consistently with the citizen's right of property."

And in State v. Newark, 37 N. J. Law, 415, 18 Am. Rep. 729, it is said:

"In a government in which the legislative power is not omnipotent; and in which it is a fundamental axiom that private property cannot be taken without just compensation, the existence of an unlimited right in the lawmaking power to concentrate the burthen of a tax upon specified property, does not exist."

See, also, Gast Realty Co. v. Schneider Granite Co., 240 U. S. 55, 36 Sup. Ct. 400, 60 L. Ed. 1239; Houck v. Little River Drainage District, 239 U. S. 254, 36 Sup. Ct. 58, 60 L. Ed. 266; and Kansas City So. Ry. v. Road Improvement District, 256 U. S. 658, 41 Sup. Ct. 604, 65 L. Ed. 1151.

If it be said that these cases involved "local assessments," and if the form of the levy here involved is to control as against its substantial effect, and the case is therefore to be distinguished from cases of "local assessment," reference may be had for examples where there is a very close analogy to the instant case, touching both the burden and the mode of imposing it, to Myles Salt Co. v. Board of Commissioners, 239 U. S. 478, 36 Sup. Ct. 204, 60 L. Ed. 392, L. R. A. 1918E, 190, and Branson v. Bush, 251 U. S. 182, 40 Sup. Ct. 113, 64 L. Ed. 215. In the Myles Salt Co. Case the burden imposed in the manner here employed was held invalid, because the plaintiff's property received no benefit, and in the latter case it was sustained, because, upon a consideration of the facts, it was held to be a reasonable conclusion that the plaintiff would be benefited by the proposed improvement. And, besides, in that case plaintiff did not seek injunctive relief until after the improvement had been made. In both cases the court assumed the right and power to inquire whether the expenditure

was, or was likely to be, beneficial to the complaining property owner, and to hear and consider evidence upon that question, and to declare the legislative act or administrative order imposing the burden invalid, if it was found to be arbitrary, capricious, or confiscatory.

[5] When it is remembered that, as declared by the Supreme Court of the state, a highway district is not a political municipality, and is not created for governmental purposes, but is limited in both its purposes and powers to the construction of highways for the benefit of its inhabitants and the property within its borders, and that the road in contemplation here is not to be for such a purpose, and can serve no substantial local need, and will be of no benefit to the plaintiff, the placing of a burden upon its property of substantially the entire cost of the work must be regarded as unreasonable, arbitrary and in effect confiscatory. The suggestion that the territory may become inhabited some time in the future, and that in such contingency the road might to some extent serve a local need, and the burden of paying the bonds might in part be shifted from the plaintiff, is beside the point. It will be time enough to build the road and fairly allocate the burden of its construction when there is need for it.

A decree will be entered as prayed for.